## FLEMING v. BEVAN.

1. An agreement by a shipper, with the captain, that he shall be interested to the extent of $5000 in the profit and loss of the shipment, gives no special or general property in the goods, but a mere right to participate in the profits.
2. The owner of a vessel, who also shipped a large part of the cargo, by his letter of instructions stated the names of third, persons who would be interested in the return cargo.    The next day he agreed the captain should be interested to the extent of $5000 in the profit and loss in the shipment.    The consignees, at the request of the captain, purchased goods for him to the amount of $5000, with the money of defendants, and consigned them to defendants, stating the agreement, and that they had been induced to make the purchase under that, at request of the captain; but if it was wrong, defendants could correct the mistake.    Defendants entered the goods, and made oath to the invoice, without stating the name of the owner.    On demand by plaintiff, they denied his right, alleging they had advanced to the shipper more than the value of the goods.   *Held*, the plaintiff could not recover, either under the agreement, purchase, and invoice, or the subsequent acts of defendants.

ERROR to the District Court of the city and county of Philadelphia.

*April* 29.—This was an action of trover for three hundred and forty-one packages of teas, marked I L F, by the plaintiff in error, against Bevan & Humphreys.

At the trial before Stroud, J., the plaintiff, having added two counts for not accounting, gave in evidence the register of the ship Venice, dated June 26, 1839, by which it appeared that John McCrea was the sole owner.    On the 5th of October, 1840, this was surrendered, and a new one taken out in the name of Matthew L. Bevan, one of the defendants.

He then proved two letters of instruction by John McCrea to himself, as captain of the vessel, dated June 27, 1839.    In the first, he was directed as to his voyage to Valparaiso, at which place his consignees were named, to obtain dollars for his voyage to Canton. Shipments from Valparaiso to Canton, on account of parties here interested in her voyage, were to pay no freight.    The letter continued : " On your arrival at Canton, you will consign the vessel to Russel & Co., who have orders to load her with a full cargo for this place." Then followed an estimate of the particular amounts of freight expected to be taken by individuals named, making, in all, 1150 tons, at $33. The two last items were—

"Thomas P. McCrea,   -    -    -    -    -    -    25

Bevan & Humphreys, balance,   -    -    -    -    60."

John McCrea was not mentioned in this estimate.    The second letter, of the same date, directed the collection of the freight and passage-money, and the payment of the balance, after deducting ship's expenses, to Thomas P., the son of John McCrea.

The outward manifest was sworn to, June 26, 1839, by which it appeared John McCrea had shipped goods to the value of $40,083 54.

On the 28th June, 1839, John McCrea and plaintiff signed a paper in the following words: "It is agreed that Capt. Fleming is interested to the extent of $5000 in the profit or loss on the shipment made in the Venice, on her present voyage, for account of John McCrea."

Plaintiff then gave in evidence the homeward manifest, in which the goods in question were marked I L F, (which were the same marks as were on other property shipped by plaintiff;) the manifest stated these were shipped by Russel & Co., and consigned to Bevan & Humphreys. Also, an invoice of teas shipped by Russel & Co. on board ship Venice, for account and risk of whom it may concern, and consigned to Bevan & Humphreys, describing them by the marks I L F. This was endorsed as examined by the custom-house officers at Philadelphia.

Annexed to this was the following:

"The above invoice of teas is shipped for account of Capt. William Fleming, by virtue of an agreement between Mr. John McCrea and Capt. Fleming in these words:" the agreement before referred to, of June 28th, was then recited. A letter from Russel & Co. to Bevan & Humphreys, dated May 18, 1840, referred to by one of plaintiff's witnesses, was read by defendants; as it explains these documents, it is given here:

"GENTLEMEN:—We hand you enclosed invoice and bill of lading of I L F, 341 packages of teas, costs $5023 04, shipped on board the Venice to your order. This investment of teas has been purchased by, and for account of Capt. William Fleming of the Venice, and we have furnished him with the sum of $5000, *out of the funds provided through yourselves, for the payment of ship expenses, and the purchase of an invoice of teas, cassia, &c.*, to be marked D F, *for account of the owners of the Venice.* Being aware of the intimate relations existing between Mr. McCrea and Capt. Fleming, we have been induced to accede to the request of the latter, by the mention of an agreement between the two gentlemen last named, and which runs thus:" (here the agreement was copied.)

"We are aware that the transaction is not strictly regular, but is put in such a shape, that if we have misapprehended the nature of the agreement between Mr. McCrea and Capt. Fleming, you will have it in your power to put the matter as it should be—the only difference being, in the marking of the packages I L F, instead of D F. You will note that the funds provided for this account were found insufficient to do more than costs of disbursements of ship, and the invoice of teas for Capt. Fleming."

Plaintiff then proved the original entry of these goods at the custom-house, October 5, 1840, with the oath of one of the defendants to the bill of lading and invoice, "for account of any person for whom I am authorized to enter the same, and that ———— ———— was owner of the goods, &c., mentioned in the annexed entry."

The custom-house officer stated, on cross-examination, a permit would not be granted, if the invoice had been altered, unless the alterations were satisfactory to the collector.

Plaintiff then called *Allen Robinett*, who said that about the 20th or 23d of December, 1841, he called with Capt. Fleming. He had a written demand. Called at defendants' counting-house. He left that paper with Mr. Bevan. He handed it to Mr. Cabot. Cabot said, "Captain, are you going to make a fool of yourself?" Mr. Bevan said, "Captain Fleming has no claim on us; he.has made no consignment to us; we owe him nothing." Two or three days subsequently, Capt. Fleming, Mr. Colesbury, and I went again to defendants' counting-house. Saw Mr. Stern Humphreys. Capt. Fleming demanded the surrender of an invoice of teas, consigned by Russel & Co. to defendants, on account of Capt. Fleming. He tendered to them $650, in bank-notes, to pay costs and charges. He would not take it in any shape, gold or silver. Would not deliver up the teas. Mr. Humphreys called me back. Said I had better persuade the captain that Mr. McCrea had no right to make that arrangement with him. That they had made advance on the goods. He showed me some book that he said was an entry of the goods on which the advance had been made.

*Daniel Smith, Jr.*—Capt. Fleming said he had some teas by the Venice. He requested me to look at the teas, and sell them. I called on Bevan & Humphreys. I asked them in relation to Capt. Fleming's teas. Mentioned what the captain had said to me. I asked Cabot if the teas were Fleming's. He said they were anybody's who would pay them back the advances made to Mr. McCrea. I endeavoured to sell them from time to time; and conferred with the defendants in relation to prices. They thought the market was advancing, and they declined selling. I called on Bevan & Humphreys immediately after the arrival of the ship Venice. I offered ninety-five cents for one hundred half-chests of young hyson, at a credit of six months, and ninety cents for the other hundred.

Cross-examined.—They did not admit to me, previous to the commencement of suit, that Fleming had any interest in these teas. I never spoke to them before that. They then said, Capt. Fleming had no interest whatever in the shipment, unless there would be enough to

cover all their advances, and leave a profit to Mr. McCrea. He stated the agreement was made with McCrea as he went down in the steamboat. That McCrea had told them that he had entered into an agreement with Capt. Fleming to give him an interest in the profits on the whole shipment; and if Capt. Fleming knew what he was about, he would be careful not to mention this business at all, because he was interested in the profit and loss of the whole purchases of McCrea, and that on the whole shipment there was a loss.

They showed me a letter from the house of Russel & Co., dated 18th May, 1840, (this is the letter.) They remarked, at the time, that it was strange that Russel & Co. had given the bill of lading as they did. The letter was then read, which is noticed above.

Re-cross-examined.—I told them what Capt. Fleming had told me, that he persisted in his opinion that he was entitled to the profits on those teas. He claimed the whole of the teas—the ownership of them. Bevan & Humphreys told me that they had delivered up these very teas to John McCrea—he having paid the advances. Don't know when the teas were delivered. The letter, I presume, came by the Venice.

*Isaac G. Colesbury*, sworn.—Went twice with Capt. Fleming to Bevan & Humphreys. Fleming said he had called. fifty times about the matter, and could get no satisfaction; that he would take legal measures; Cabot said he was a fool. On the second time, he told Humphreys he came to pay him the costs and charges—made a tender. Humphreys said he would not accept it if they were gold or diamonds. Fleming asked him if he hadn't received the teas; if he had not said to me there is the key, and I could have access and might sell; didn't you say, " I am glad you have hit upon a trump card, and will make some money by it?" Can you deny all that? Humphreys said, " I'll not say any thing about that now," or, " I will not argue it one way or the other."

Cross-examined.—Mr. Humphreys was ashamed when Capt. Fleming put the question, and backed out—went away.

Plaintiff then proved a purchase of the teas, at sixty-five cents, from him, a refusal to deliver them by defendants, and a subsequent rise to eighty-five cents.

*John H. Irvin.*—I purchased, from John McCrea, the forty-eight chests of Shoulang, eighty-one cents cash. McCrea told me, when I was ready, to take the check down and pay Bevan & Humphreys. I took the check down, $996 30. The teas rose subsequently to eighty-five cents.

Cross-examined.—I had no intercourse with Capt. Fleming.

*Francis H. Tiers.*—Bought in November, 1840, from John McCrea, shortly after the Venice arrived, four hundred half-chests of Shoulang teas, at fifty-five cents, eighty-eight boxes of Young Hyson, at one dollar, I L F.   Deduction afterwards made by McCrea of $20 on bill. I think he remarked they belonged to his son.

His honour, the judge, thinking the evidence did not warrant a verdict, directed a nonsuit, which the court in banc refused to set aside, and plaintiff sued out a writ of error.

*Randal,* for plaintiff in error.—A nonsuit having been directed, the question is, whether there was any evidence given by the plaintiff which, standing alone, warranted a verdict.   It will be observed, we knew no one as owner of the vessel until her return, excepting J. McCrea, who was also the owner of the greatest part of the cargo.   Bevan & Humphreys were unknown to us in the transaction. And whatever interest they had was satisfied, as we proved a delivery of this property to McCrea by them before suit brought.   If the agreement of the 28th June was doubtful, it was susceptible of explanation by the subsequent transactions ; and it might fairly be inferred something else was understood—that he was interested in the cargo to that extent.   This agreement between the owner of the vessel and cargo and the captain, who was also supercargo, existed without change until the shipment by Russel & Co. in Canton.   These consignees represented the shipper, and by their conduct consummated the agreement.   If there was any fraud in this, the party was bound to disavow it promptly, Bredin *v.* Dubarry, 14 Serg. & Rawle, 27. And not having done so, they ratified it.   The subsequent conduct of the parties thus ratifying the act of the consignee, was evidence for the jury on the construction of the original agreement.   The evidence of ratification is plain ; the invoice showed on its face that Russel & Co., and the captain, thus understood the agreement ; but to prevent suspicion, an opportunity was given to disavow the act by the letter accompanying the invoice, directing a change of the marks if the shipment was for an improper party.   Did they make a change, or do any thing which looked like a disavowal ?   So far from it, the invoice was sworn to be correct ; and the form of the oath is material ; it is that taken by a consignee, being factor ; not that directed by law in case of an owner.   The name of the owner is omitted, which is a very material question at the custom-house on the amount of duties.   This is followed up by the parol evidence of Colesbury, showing that defendants admitted the right of plaintiff, but set up a claim for an advance to McCrea, which we also showed had been paid.   There is

no evidence of advances, nor any right by defendants. So far as appears, they were mere trespassers; for no right from McCrea to them is shown. It may be when they show their case, we will be bound to account for the $5000, but not until they prove some title.

As to the right of property, Smyth v. Craig, 3 Watts & Serg. 14, settled that; the goods were, in the language of the court, segregated from the mass. And without the aid of the agreement, the purchase and shipment vests the right in us, subject to an account.

*Williams*, contrà.—To sustain this suit, a right to the specific articles must be shown. What was the agreement? not an interest in the cargo, but in the profit and loss. If there were no profits, he could have no claim. It was, that the profits were to be divided in the ratio of $5000 to $40,000 and expenses. Any other construction of the agreement would be absurd; it would be a gift without consideration of an eighth of the whole shipment.

The first letter of instruction shows who is entitled, for the return cargo was to be purchased by the outward one; and McCrea says, he is to have no interest in that; the plaintiff must have seen, from this, the right of McCrea had been transferred, and after this information the agreement was made.

· The letter of R. & Co. shows the invoice was purchased with the money of B. and H., not of McCrea. The invoice is made conditional, by the accompanying letter; if right it is to stand, if not, B. and H. are to alter it, and make it right. The only question then is, whether R. & Co. were right in making such an invoice; for an error in that cannot transfer property to the party causing the error. It was for whom it may concern, and with that contingency they made the entry, not stating the owner, as the custom-house did not require it.

If the plaintiff's construction be the correct one, he is a partner, and cannot sue for these goods. He must settle the accounts first; his tender was merely of the charges on the goods; as to the transfer of the vessel, that could not be made until its return.

Have the acts of the defendants, since the arrival, changed the property? if so, it will surprise them very much. They had no right to alter the marks on the goods; for the custom-house regulations forbade that; and they knew R. & Co. had, without authority, appropriated their money to the purchase of goods for another; was it not sufficient, having the right of possession, simply to retain it and deny the right of the other party? The clause at the foot of the invoice was not sworn to, though they could not separate the papers. Possession, or the right

2 M 2

which draws possession, is necessary to trover, Matther *v.* Trinity Church, 3 Serg. & Rawle, 512; special property requires actual possession.   The bill of lading does not give property when it explains on its face who is entitled, Griffith *v.* Ingledew, 6 Serg. & Rawle, 444.   And the master waives his right by signing the bill, Stoughton *v.* Rappalo, 3 Serg. & Rawle, 562, 563.   Nor has the master any possession except in that character, by the fact the goods are on board of his vessel, and our lien for advances is a defence to an action of trover. Hutton *v.* Bragg, 7 Taunt. 14; Jarvis *v.* Rogers, 13 Mass. 105; Montague on Lien, 8.

*May* 1.   KENNEDY, J.—From a careful examination of the evidence, given on the part of the plaintiff on the trial of the cause, in the court below, we cannot discover the slightest tendency in it, going to prove or show such right in the plaintiff to the tea in question, as could entitle him to recover in this action.   The evidence given by him only went to show, at most, that by his agreement, bearing date the 28th day of June, 1839, made with John McCrea, the owner of the ship Venice, by whom the plaintiff was employed to take charge of the ship as the captain and commander thereof, he acquired an interest to the extent of $5000 in the *profit* or *loss* on the shipment made in the ship, then in the Delaware river, on her voyage by way of Valparaiso to Canton.   If a profit were made on the shipment, then the plaintiff was to participate therein; but if a loss should arise therefrom instead of a profit, then he was to bear his proportion of it.   But from the agreement taken per se, it does not appear that he was to have a right, in any event, of either a special or general property in the shipment of the vessel, either outward or homeward, or in the tea in question.   Neither can we perceive, from any of the other testimony given in the cause, that it was the intention of McCrea, or of any of those who had an ownership in the cargo, of which the tea in question formed a part, that he should have a right of property, or any other right to the tea, that would entitle him to the possession of it, so as to enable him to recover it from the defendants.   It does not appear from the evidence, that McCrea ever consented that the plaintiff should have a right of property in the tea, or even the possession of it.   On the contrary, it appears that McCrea sold part of the tea to Francis H. Tiers, in the month following the arrival of the vessel, saying it was his son's tea. Nor does it appear that the defendants ever acknowledged or admitted any right or claim of the plaintiff to the tea; they, when spoken to on the subject, said, that the plaintiff had no interest whatever in the shipment unless there should be enough to cover all their advances, and

leave a *profit* to Mr. McCrea; that McCrea had told them that he had entered into an agreement with the plaintiff to give him an interest in the *profit* on the whole shipment.    And although Russel & Company of Canton were intrusted with the purchase of the cargo put on board of the ship Venice at Canton, of which the tea in question was a constituent part, and state in their letter of the 13th day of May, 1840, to the defendants, that the investment of teas had been purchased by, and for account of Captain William Fleming, the plaintiff, at the request of the latter ; yet the purchase was made with $5000 furnished by Russel & Co., out of the funds provided by the defendants for the payment of the ship's expenses, and the purchase of an invoice of teas, cassia, &c.; remarking also, that the *transaction* was *not strictly regular*, but was put in such a shape that if they had misapprehended the nature of the agreement between Mr. McCrea and the plaintiff, (of the nature and effect of which I have spoken above,) they would have it in their power to put the matter as it should be; so that from all that Russel & Co. said and wrote on the subject, the plaintiff was to have no *right of property* in the tea as a purchaser thereof, unless, according to the agreement made between him and McCrea, he was entitled to it.    But that agreement, as has been already shown, provides merely for an interest in the *profits* of the cargo, and not for a right of property in it to any extent whatever.    Besides, Russel & Co. were acting, in what they did, as the agents of McCrea and the defendants, using the funds furnished by the defendants, and had no power or right, even if they had been so disposed, to invest the plaintiff with the right of property, in equity at least, to the tea, by giving him the money belonging to the defendants to buy it, that he might make it his property, and a part of the cargo of the vessel, to the exclusion of those for whom they were instructed, and consequently bound to purchase with the same money or funds, and thus make up a cargo for the vessel to the full extent of its tonnage.

We therefore think the judgment ought to be affirmed, and accordingly affirm it.